[Crim. No. 4217.   First Dist., Div. One.   Sept. 10, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE DALE GIBSON, Defendant and Appellant.

16

John H. Sutter, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, P. J.—Defendant was charged in the information with two counts of robbery and one of assault with a deadly weapon. At the trial, the district attorney dismissed the assault count. The jury found defendant guilty under the other two counts and fixed the degree of robbery as first degree. Defendant appeals from the judgment of conviction. He also purports to appeal from the order denying motion for new trial.[1]

QUESTIONS PRESENTED

Defendant contends that his arrest and subsequent search were unlawful because (1) the officers illegally stopped him, and (2) the facts are insufficient to justify the arrest and search.

EVIDENCE

On February 2, 1962, at approximately 3 a.m., a man wearing a black hat, brown coat, wearing sunglasses and having a blondish mustache robbed a gas station at 5330 Foothill Boulevard in Oakland. The robber, subsequently identified as the defendant, took approximately $50 and, upon leaving, struck the attendant several times on the head with a shiny object the attendant said looked like a gun. The attendant heard the robber run away and what sounded like taps on his shoes.

Between 3 and 4 a.m., the morning of February 6, 1962, a man, subsequently identified as defendant, entered a Shell gas station at 3811 San Leandro Boulevard, Oakland. The man was wearing a blue overcoat or topcoat, a black hat and sunglasses. Defendant placed something hard in the attendant's back and forced the attendant to give over $60 or $70. The attendant then was rendered unconscious by a blow to the head.

At approximately 4 a.m. of February 6, 1962, Officer Phillips and Sergeant Warren of the Oakland Police Depart-

---

[1]An order denying new trial is reviewable upon appeal from the judgment and is not itself appealable. (Pen. Code, § 1237.)

ment were driving in a police vehicle in the vicinity of 85th Avenue and East 14th Street in Oakland. The weather was drizzly. At this time, they received a radio call concerning a robbery which had occurred at 38th Avenue and San Leandro Boulevard (the above mentioned Shell station). The robber was described as a white male wearing a dark colored hat, dark glasses and a leather coat. It was stated that he had used a piece of pipe or some metal object to hit the victim. Nothing was said about the robber having a car.

From their position at the time of the radio call, the officers drove south to San Leandro Boulevard and proceeded westbound thereon until they stopped at 77th Avenue for a red light. At this time, some one or two minutes after the radio reception, they observed a green MG roadster driven by defendant eastbound on San Leandro Boulevard stopped at the same red light. It continued eastbound when the light turned green. The officers executed a U-turn behind the MG and proceeded to follow it for about 16 blocks. The car was traveling about 25 miles per hour in a 35-mile zone. There was only one other car on the street at this time. The officers thought this speed was unusual at that time of night and became suspicious. They said that normally at that time of night cars travel faster than that. They thought the driver was drunk or possibly the robbery suspect because of his slower driving.

While they were following, the officers observed a motion in the MG which looked to them like ''someone was trying to put something in the back part of the car'' or ''someone moving something in the car.'' The officers then sounded the siren once and turned a red spotlight to the rear window of the MG to signal the driver to pull over and stop. Defendant failed to heed the signal for some 6 or 8 blocks and stopped only when the police car drew abreast of the MG and Sergeant Warren motioned defendant to pull over.

The officers parked to the rear of the MG and Sergeant Warren approached the car and shined a flashlight in at the driver. Defendant got out of the car when asked to do so by the sergeant and was told that the officers were investigating a robbery. The officers said that defendant while in the car had on a dark hat. The hat was left in the car when defendant got out, and appeared wet when the officers looked at it from outside the car. The officers thought it was the hat described in the radio description. The officers saw in the compartment behind the seat what looked like, and they

thought was, a leather coat. Throughout this period the officers were standing outside the car looking into it with the aid of a flashlight. Sergeant Warren then patted down the outside of the defendant's clothing to feel for weapons and felt what seemed to be a pair of glasses in the left pants pocket. He then removed a pair of dark sunglasses from the defendant's pocket. Thereupon Sergeant Warren put his head or body in the car and the first thing he saw was a short length of pipe approximately 12 inches long, with a "T" on it, which was in the compartment back of the bucket seats. The sergeant found the overcoat, which was dark blue (not leather) with $61 in one of the pockets. Defendant had no answer as to how he got the coat wet. Prior to the time the officer searched the car the defendant had been placed in the police car. The officers then made out an arrest report. Then they sent him to the police station in the paddy wagon. Before entering defendant's car the officers asked defendant if he had any money. He said that he did not. When later at the police station they asked about the $61 defendant stated that he had won it at the race track and forgotten all about it.

At the station, Inspector Madsen removed the defendant's shoes, finding that the left shoe had a tap on the heel and the right shoe had an indentation indicating that a tap had been affixed thereto.

Defendant testified in his own behalf. On February 2 and 6, 1962, he had been employed at the Chevrolet plant in East Oakland. He worked from 4:30 p.m. in the afternoon until 1 a.m. the following morning.

Defendant stated that on February 2, 1962, he got off work at 1 a.m. and was driven home by a friend, and that he spent the night at home with his wife. Neither the friend nor defendant's wife testified.

Defendant testified that on February 6, 1962, he got off work at 1 a.m., went home, cleaned up, and then went to a bar in West Oakland, staying there until it closed at 2 a.m. He said he then went with a woman he met in the bar to her residence and stayed there until 3:15 or 3:30 a.m. when he went to a restaurant at 12th and Broadway in Oakland and had something to eat. The woman defendant said he met did not testify.

Defendant said that while on the way home he did not see the officers' red light or hear the siren, that he was driving slowly because he had been drinking, that he had not worn the hat, coat or sunglasses that night; that he was wearing a

black leather jacket. He further asserted that he won the money at a race track the previous Saturday, and that the pipe found in the car had been given to him some time previously by his father-in-law to connect a gas stove.

1. STOPPING THE DEFENDANT.

In California, the courts "have consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons. Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citations.]" (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450-451 [30 Cal. Rptr. 18, 380 P.2d 658].) "The courts of this state consistently have adhered to the proposition that a police officer may question a person outdoors at night when the circumstances are such as would indicate to a reasonable man in like position that such a course is necessary to the discharge of his duties. ... " (*People* v. *Ellsworth* (1961) 190 Cal.App.2d 844, 846 [12 Cal.Rptr. 433].) Thus, the standard is whether the facts and circumstances are such as would indicate to a reasonable man in a like position that an investigation is necessary to the discharge of his duties. (*People* v. *Ellsworth, supra,* 190 Cal.App.2d at pp. 846-847 and cases there cited; see also *People* v. *Alcala* (1962) 204 Cal. App.2d 15, 19 [22 Cal. Rptr. 31].) Illustrative of the quantum of facts necessary to justify stopping a vehicle for investigation is *People* v. *Porter* (1961) 196 Cal.App.2d 684 [16 Cal.Rptr. 886], where officers were on patrol in a police car about 3:25 a.m. They observed the defendant drive by with a companion. About 25 minutes earlier they had observed the defendant drive by on the same street alone. It was held on the basis of these facts that a stop for questioning was justified under the above noted standard. The fact that a driver proceeds at a speed slower than the speed limit under circumstances where he might normally proceed at the higher speed also is a factor appearing to justify an officer's investigation. (See *People* v. *Alcala, supra,* 204 Cal. App.2d 15; *People* v. *Anguiano* (1961) 198 Cal.App.2d 426 [18 Cal.Rptr. 132].)

In the case at bench the officers, within one or two minutes after the radio call concerning the robbery, saw defendant in his car on the same street on which the robbery oc-

curred, although some 40 blocks away. After stopping at a red light the car did not speed up as the officers found that other cars did at that hour of night. They thought on account of his driving slower than normal that he might be a drunk driver or that he might be a robbery suspect. Also, while they were following him they observed the movements in the car, which might alone be considered innocuous, but considered with the other facts would appear to lead to a cumulation which justified the stopping and investigation. *Wirin* v. *Horrall* (1948) 85 Cal.App.2d 497 [193 P.2d 470], condemning indiscriminate police roadblocks, is of no application under these facts and defendant's reliance on it is misplaced. (See *People* v. *Ellsworth, supra,* 190 Cal.App.2d at p. 847.)

The stopping of a person for interrogation does not necessarily constitute an arrest. (See *People* v. *Ellsworth, supra,* 190 Cal.App.2d at p. 847, and *People* v. *King* (1959) 175 Cal.App.2d 386, 390 [346 P. 2d 235].) Under the circumstances here, the officers did nothing illegal in stopping defendant and searching his person for weapons. However, it should be noted that after stopping defendant for the purpose of interrogating him, they did not do so, but almost immediately placed him in their car and started to search his car.

2. THE ARREST AND SEARCH.

As to the arrest, the officers did not testify that they arrested defendant at any particular time. However, the facts show that they stopped his car, had him get out, observed the hat and coat, checked his clothing for concealed weapons, discovering the sunglasses, and then placed him in the police car. Only then did they undertake a search of the defendant's car. In section 834 of the Penal Code an arrest is defined as "taking a person into custody, in a case and in the manner authorized by law." Section 835 provides: "An arrest is made by an actual restraint of the person, or by submission to the custody of an officer." Prior to the time defendant was placed in the police car the officers were in the process of investigating. It would thus appear that defendant was not "arrested" until he was placed in the car, i. e., detained or restrained (see *People* v. *Drake* (1912) 162 Cal. 248 [121 P. 1006]) more than momentarily as by the stopping for investigation.

"Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is

no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]. . . ." (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].)

■ If, before a search is made, the circumstances are such as to justify the officer in making an arrest, it is immaterial whether the search precedes or follows the arrest. (See *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294 [295 P.2d 36] and cases there cited.) So here, it is immaterial whether defendant was arrested the moment he entered the police car or later. ■ The crucial question is, at the moment the officers started to search the car did they have probable cause for making an arrest of defendant?

■ The determination of this question must be based upon the knowledge that the officers then had. What they discovered in the search cannot be considered. (See *People* v. *Mickelson, supra,* 59 Cal.2d 448, 454; *People* v. *Brown* (1955) 45 Cal.2d 640, 643-644 [290 P.2d 528].)

■ A peace officer may make an arrest without a warrant " [w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." (Pen. Code § 836, subd. 3.) The general test of probable cause is one of reasonableness, a factual question whether at the time of the arrest the officers had sufficient information which would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion that the person in question is guilty of a crime. (*People* v. *Ingle, supra,* 53 Cal.2d at p. 412; *People* v. *Fischer* (1957) 49 Cal.2d 442, 466 [317 P.2d 967] (holding further that probable cause for an arrest "may exist even though there may be some room for doubt"); *People* v. *Ingle, supra,* at p. 413 (holding also "It is not limited to evidence that would be admissible at the trial on the issue of guilt").)

■ The information the officers had prior to the search follows: They had heard a robbery report describing the robber as wearing a dark felt hat, a leather coat, and dark colored glasses. Defendant's driving was unusual under the circumstances. He failed to respond promptly to the siren and red light. They saw action in the car looking as if the position of something in the car was being changed. The officers saw that defendant was wearing a dark felt hat. Before they searched the car, they saw in it what looked like a leather coat, and beads of rain on the hat as if the hat had

been in rain a short time and the rain water had not yet been absorbed. ■■■ Seeing the items from outside the car was not a search (*People* v. *Porter, supra,* 196 Cal.App.2d 684, 686) even though a flashlight be used to view the inside of the car (*People* v. *Beverly* (1962) 200 Cal.App.2d 119, 125 [19 Cal.Rptr. 67]). ■■■ The officers also had the right to conduct a superficial search of defendant's clothing. (*People* v. *Mickelson, supra,* 59 Cal.2d 448, 450; *People* v. *Brittain* (1957) 149 Cal.App.2d 201, 204 [308 P.2d 38].) ■■■ They discovered the sunglasses. Was this enough to justify a reasonable belief that defendant was the robber?

In the recent case of *People* v. *Mickelson, supra,* 59 Cal.2d 448, the circumstances were surprisingly similar and it was held that the facts known to the officers were not sufficient basis for probable cause. There police officers received a report of a robbery, describing the robber as a "fairly tall white man of large build with dark hair who was wearing a red sweater. . . ." (P. 452.) While driving in the area of the robbery some 20 minutes later the officers saw a car whose driver seemed to match the description. The car was being driven in an erratic manner, going into and out of side streets and back to the main street toward the store which was robbed. The officers followed the car and observed defendant, the passenger, " 'bend forward in the seat, forward and down and raise back up.' " (P. 453.) The officers caused the driver (Zauzig) to pull over. Defendant and the driver both got out of the car on request. The driver showed his license and told the officers he was lost and trying to find the freeway, thus his erratic driving. Nothing the driver said indicated that he had perpetrated a robbery; the officers were satisfied. But they searched the car, finding incriminating evidence.

The court held that search of the car was not justified by probable cause to make an arrest. "It was not unreasonable for the officer to stop Zauzig's car for investigation and to take reasonable precautions for his own safety. He did not have probable cause, however, to arrest Zauzig for robbery. There could have been more than one tall white man with dark hair wearing a red sweater abroad at night in such a metropolitan area. Although Zauzig was in the vicinity of the robbery, he was not observed until about 20 minutes after it occurred when he was driving toward the scene of the crime, not away from it. The officer had no information that the robber had an automobile or a confederate. The erratic route

of the car and defendant's movement in the seat were at most suspicious circumstances. The officer's investigation elicited identification upon request and a story consistent with the movements of the car and the officer's own assessment of those movements. Both occupants were out of the car away from any weapons that might have been concealed therein. Instead of interrogating Zauzig and defendant with respect to the robbery or requesting them to accompany the officers the few blocks to the market for possible identification, the officers elected to rummage through closed baggage found in the car in the hope of turning up evidence that might connect Zauzig with the robbery. That search exceeded the bounds of reasonable investigation.'' (P. 454.)

In our case the officers saw a white man wearing a dark colored hat, who had dark colored glasses in his pocket, and what appeared to be a leather coat in his car.[2] The white male, dark hat and possession of sunglasses corresponded with the description given of the robber, just as in *Mickelson* the suspect's being a fairly tall white man with dark hair, wearing a red sweater, corresponded with the robber's description. Here, just as in *Mickelson*, the driver was driving in a suspicious manner (the driver in *Mickelson* was driving in a more suspicious manner than did defendant). In both cases a movement was made in the respective cars indicating that something was being moved therein. The only practical difference between the situations in the two cases was that defendant here did not respond to the one blast of the siren and red light until the police car breasted him, and the fact that in *Mickelson* the officers sought and received an explanation of the driver's suspicious driving, while in our case the officers made no inquiry of defendant nor had any conversation with him other than informing him they were investigating a robbery. As in *Mickelson*, the officers did not interrogate defendant as to the robbery or request him to accompany them to the gas station for possible identification. They apparently asked for no identification of defendant. Defendant's clothing was not uncommon garb and could well have been worn by many others in the ''metropolitan area.'' Defendant was observed some 40 blocks away from the scene of the crime, but driving away from it. Just how soon after the robbery the officers saw defendant does not appear. While it was only about two

---

[2]Although defendant testified that he was wearing a leather coat at this time, neither of the two officers who stopped him testified as to whether or not he was wearing a leather coat.

minutes after the radio call, the evidence fails to disclose exactly what time elapsed after the robbery before the call was made. The attendant at the Shell station testified that the robbery occurred at a quarter to 4 in the a.m. Officer Phillips testified that the radio call came ''at approximately 3:30 or 4:00 a.m.,'' Officer Warren that it came ''around 4:00 a.m.''

Defendant got out of the car on request and the officer said that he could then determine that defendant was sober. Defendant was cooperative and offered no resistance. There was nothing to indicate the robber had a car.

The facts distinguishing the instant case from *Mickelson*, the fact that defendant was driving away from the scene of the robbery, his failure to pull over promptly (but not increasing his speed) and the discovery of the sunglasses in a legal search, seem not to outweigh those factors which are similar, particularly since the court seemed to say that an attempt should be made by the officers to have the suspect identified by the victim. It also appears from *Mickelson* that similarity of the suspect's clothing, if the clothing is not particularly uncommon, to the reported robber's, is not sufficient justification for an arrest and search. *Mickelson* compels this court to hold that the officers did not have probable cause even if the sunglasses are considered, since they seem no more or less innocuous than a red sweater.

In *People* v. *Harris* (1956) 146 Cal.App.2d 142, 145 [304 P. 2d 178], the court indicates that where, after stopping a motorist for investigation the ''questioning elicited answers consistent with innocence no basis was established for arresting him and searching him and his car.'' How much more would this be true where no questions of the driver are asked.

''A peace officer . . . may without a warrant, arrest a person; . . .''

''3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony. . . .'' (Pen. Code, § 836.)

The circumstances confronting the officers at the moment of search were not such as to cause a reasonable person to believe that defendant was the robber in question. At best they raised a very slight suspicion that he might be. This is not enough, particularly as the officers made no effort to interrogate him or suggest that he accompany them to the scene of the robbery.

As said in *People* v. *Schraier* (1956) 141 Cal.App.2d 600, 603 [297 P.2d 81], ''But a mere suspicion does not justify

the arrest or search of a person present under such circumstances."

■■■ Because of the unlawful arrest and search, both convictions will have to be reversed. The hat and the glasses, which were illegally seized, as we have shown, were identified by the attendant at the Simas Bros. gas station where the first robbery occurred, as the same worn by the robber there. Moreover, at the police station where defendant was taken after his illegal arrest, his shoes were examined for taps, and the officers testified that there was a tap on one shoe and indication that there had been a tap on the other. The victim of the first robbery testified that when the robber ran out there was a sound of taps on his shoes. Thus defendant's conviction of the first robbery was partly based upon the illegally obtained evidence. Under all the circumstances of this case, the convictions on both counts must be reversed.

In view of our decision, it is unnecessary to consider defendant's contention that on other grounds than the illegal search the admission into evidence of the pipe was erroneous.

The appeal from the order denying new trial is dismissed. The judgment is reversed.

Sullivan, J., and Molinari, J., concurred.

A petition for a rehearing was denied September 30, 1963.